on behalf of Mr. Vasquez, who is the defendant and the appellant. I'd like to reserve five minutes of my argument for rebuttal time. This matter presents an altercation in a Federal Bureau of Prisons facility out at Sheridan, an altercation that never should have occurred. There were three entities or individuals, if we want to recognize each of them, who were involved in the altercation.  There were three entities or individuals, if we want to recognize each of them, in some way responsible for the fact that this altercation took place. Our position is that the least responsible of those three is the individual who is currently being punished, and solely punished for what happened. Mr. Vasquez was a gentleman three weeks into a custodial sentence at Sheridan, his first Federal custodial sentence. He was placed in a unit at Sheridan. He was sitting playing Pinocchio with Mr. Spears, an elderly African-American gentleman, and he was doing his time, at which point Theodore Vickers, a somewhat older, 10 years older, but significantly larger, inmate who had been at Sheridan for years, who had had a history of Federal convictions, and he was serving a supervised release violation, engaged in a verbal altercation with Mr. Vickers that included obscenities, threats to rip his head off and shove it in bodily parts, and challenged him verbally on the tier in front of every other inmate on the tier to a fight. We're aware of the facts of the case. Pardon? We're aware of the facts of the case. Yes. This was heard by the correctional officer, Gensrod. And specifically, what Officer Gensrod heard was not Mr. Vasquez challenging to a fight, not Mr. Vasquez engaging in any type of verbal altercation, but Mr. Vickers. Vickers' conduct at that moment was a violation of BOP policies at the 200th level. Clearly established, BOP policies and guidelines for Officer Gensrod was to sanction Mr. Vickers immediately, remove him from that unit. Gensrod did not do so. Instead, he left. He left the unit with no correctional officers present. He left Mr. Vasquez sitting there with another inmate having challenged him verbally to a fight and being told by other inmates that he had no option but to fight him. We wanted to present the defense of duress, that the situation given to Mr. Vasquez at that moment left him with no option but to eventually have a physical altercation. So this is the legal issue now that we come to, and duress requires a showing of immediacy. Correct. How can you get around that? What's your response? The immediacy is there is less than 10 minutes between the verbal challenge to a fight. Mr. Vasquez then retreats to the Hispanic TV room. Vickers comes to him and is standing at the door. So, Counsel, again, if you could focus on the legal issue, because we read everything and we understand the facts of the case, and your time is ticking down. I know it's very important to your clients. So, really, my question goes to the immediacy. I think in order to prevail here, you'd have to show that your client didn't have any other opportunity to avoid the threat that you're arguing, you know, within that period of time. Is that your contention? He had no way to ask for help from prison officials? Yes, Your Honor, because at that point, Officer Gensrod was no longer in the unit. Mr. Vasquez was standing in the PISA TV room when Vickers came to him, and that's when the fight initiated. He is in a small room in a correctional unit with no correctional officer. I'm having trouble distinguishing or understanding the difference between the duress theory and your self-defense theory. In both theories, isn't the source of the physical threat Vickers? And in both theories, isn't Vasquez's reaction to the threat attacking Vickers? I don't believe that there's disputed evidence on who initiates the specific physical altercation. If you review the video, and the video is important here, we see Vickers, we see his leg go up. We don't see any prior movement from Mr. Vasquez. But the law on both self-defense and duress is that if you have a reasonable belief that you are about to be hit, you do not have to actually wait to be hit to throw the first punch. And Mr. Vasquez is standing in the Hispanic TV room. Vickers and Teddy Morris come to him, and Vickers is standing at the door of the Hispanic TV room, telling Mr. Vasquez that he is there to kill him or rip his head off or otherwise assault him. That is a pretty immediate threat that Mr. Vasquez has no way of removing himself from. And the guard ---- Let's talk about that, because even assuming Mr. Vickers initiated the confrontation such that Mr. Vasquez had a right to defend himself or was under duress, which I'm still having a little trouble with, Mr. Morris testified that when Vickers was already limp and no longer fighting back, Mr. Vasquez lifted him three feet off the ground and then, quote, slammed his face onto the concrete floor. Vickers' treating physician, I think, then testified that Mr. Vickers' injuries were consistent with Mr. Morris' account. And I'm just trying to figure out how a rational trial of fact could conclude that basically pile-driving Vickers' limp body exceeded the scope of any right to self-defense Mr. Vasquez might have initially had or the duress theory. Can you help me with that? Yes, Your Honor. There are two times that Mr. Morris testified. The one you're referring to is the one which he then demonstrated with a 30-pound mannequin that he picked up, threw violently to the floor, and broke before the jury in a manner that the trial court acknowledged was startling. I called shocking and requested a mistrial, which was denied. The second time Mr. Morris testified, he acknowledged that what he saw was Mr. Vasquez on his knees, on the floor, with Mr. Vickers standing over him, and somehow in a maneuver, Mr. Vickers was able to get Mr. Vasquez was able to get Mr. Vickers off of him. That is the second time. But the jury apparently heard all of that, correct? Correct. All right. And so isn't it possible, then, that the jury – I mean, it's likely. I mean, we have to look at the light in the back and the light most favorable to the prosecution here, correct? Correct. So I'm still trying to understand your point. Even if they heard the second, you know, statement of Mr. Morris, which I'm sure they did. There are two elements of self-defense, not simply whether or not there was a reasonable use of force. And as Your Honor noted, there was one expert for the prosecution. There was also an expert for the defense who testified that this was more consistent with the fall that was heard by the correctional officer, such as the sickening thud after Mr. Vickers left. The other element, which is what the jury might have found on, is whether or not Mr. Vasquez had a reasonable belief that he was about to be the victim of an immediate assault because the government was allowed to present and create a false impression that Mr. Vickers had no intent to engage in a fisticuffs with Mr. Vasquez. And specifically, he had no intent because he was waiting for his immediate release. And that is the third claim that we raised, which was the denial of our ability to challenge that evidence with relevant evidence that showed, in fact, Vickers had a history of violence in prison. He had assaulted another gentleman just six weeks prior to this incident with Mr. Vasquez, and he was well aware of his programming for release at that point in time. We were denied the right to confront that evidence. The only reason for the government to present the evidence regarding Vickers' short time left in prison was to argue that he had no intent to engage in an assault against Mr. Vasquez. They presented numerous witnesses. I'm sorry. But there's still other facts. I know you're – and it's your job, and I respect that, to get the facts you think put your client in the best light. But if I recall correctly, I mean, there were facts that when this fight started to brew, I guess is the best way to put it. Vickers stood in the doorway of the TV room. Vasquez hit him with a chair. Though he was very upset and mad at Vasquez, Mr. Vickers still wanted to talk things out without getting into violence. Vasquez then charged at Vickers. Vickers tried to kick Vasquez in the chest to stop him, but Vasquez cast Vickers' leg aside, punched him in the face, and threw him to the ground. Vickers eventually stood up, and the two traded blows for a few seconds outside of the TV room before going back in. I mean, accounts differ on precisely what happened after that, but in the end, Vickers ended up being severely injured, had an operation on his fractured skull that required titanium plates and 20 titanium screws, and that cost over $40,000. So I'm still trying to figure out how the jury, how there wasn't sufficient jury to find the verdict the way they did. There is no question that because the government was allowed to present a case and Mr. Vasquez was not allowed to present his evidence that would confront that case and dispute those cases. And what precisely is the evidence? The evidence is that the BOP failed in its obligations, and that left Mr. Vasquez with no option but to fight. That somehow the BOP could have intervened. Yes. That's Warden Beese's testimony, that not only could they, they should have clearly established policies. So this goes to the guard leaving. Yes. Right. And the fact that that left Mr. Vasquez with no defense. There was the evidence that Mr. Vickers was, in fact, had previously, just six weeks before, engaged in a physical assault, so the contention that he was not there to fight Mr. Vasquez was highly suspect. There was significant additional evidence from Warden Beese, from the conduct of the guards, regarding Vickers and his history, that had the jury heard could well have changed the outcome of the trial. There is no question that if you allow the government to present its best case and tie the defendant's hands, you are going to have sufficient evidence to convict. But you had ample evidence, though, to inquire into Vickers' motivation in going to the TV room. You were just precluded from bringing in the collateral evidence. Is that right? I mean, you could ask any questions and bring all of that out through your cross examination or direct examination. You just couldn't put, you were just precluded from bringing in the collateral evidence. Is that right? I was not allowed to confront the evidence that Vickers would not have engaged in a fight because he was a short timer. But the trial court has a lot of discretion there. The trial court was essentially concerned that was going to be a trial within a trial and it was going to be a distraction. There's a lot of discretion there, Counsel. On a confrontation clause claim, it's a de novo review. If this elements was relevant to evidence presented by the government and the government created a false impression, they created the false impression that Vickers was a short timer, that he was looking forward to get out, that he would therefore not engage in physical violence, and that he did not want to. And they drew it all together in their closing argument to the jury, telling them that he didn't want to go, he didn't want to be disrespected by others, he had to go up there and try and talk his way out of it, go home in a few weeks instead of spending all his time in the hole. So it's your position that the trial court was obligated to allow that testimony? Yes. It's a confrontation clause violation. Once the government has presented this evidence, has created this impression, we have to be able to confront it or else Mr. Vasquez is deprived of the Sixth Amendment right to confront the evidence. In what way or ways, I want to make sure I understand all of them, did that come in? Was that impression created apart from Vickers' testimony? It was created apart with Mr. Spears' testimony, Mr. Morris' testimony, Lieutenant Payne. The specific document showing Vickers' programming release was presented. How did Morris reinforce that? Did he speak specifically to the upcoming release? Yes, he did. He spoke specifically to the fact that they were talking about being released, that Mr. Vickers was looking forward, he had 20 days left. I quote all of those in the appellant's opening brief on pages 17 through 20. But he said that in front of the jury. The jury heard that from the cellmate. Yes. And they also heard it from Lieutenant Payne who talked about that, from Mr. Spears who talked about that. And then it was all drawn together. And if you look at the motions, the preliminary motions, the government filed to preclude us from presenting the evidence of Randall Brown. There wasn't factual. I couldn't understand the last thing you said. Certainly. The government filed what? There were not factual disputes on the fact that there was an altercation with Randall Brown. Mr. Vickers admitted it. There were documents showing that Randall Brown was taken as the victim of an assault at the infirmary, that several white inmates stood around him as he left and he was never willing to name it. Mr. Brown confirmed for us it was Vickers and was willing to testify. The government. That's why it was going to be a trial within a trial, right? Well, it was going to be a few additional trials because the facts, Vickers did not dispute that he had that altercation. Right, but the question was who was the aggressor and that was going to be the issue that the trial court was concerned about, right? I'm not sure that that was the issue. She focused on an undue prejudice analysis. The government moved to keep out the evidence of Mr. Brown's altercation. We cross-moved and said, fine, if Mr. Brown is not going to come in, do not allow Mr. Vickers' short time to come in. The government admitted in the hearing that the only reason to present the evidence of Vickers' short time was to argue to the jury that he would not engage in a fight because he was short time. That was the only relevance to that evidence. Our only ability to confront that evidence was to show that, in fact, he would engage in physical violence. Just six weeks prior, he did engage in, and it's irrelevant who's the aggressor there because if it's a mutual fight, he still goes to the hole. It is still a level 200 violation. It doesn't matter whether Brown or Vickers is the aggressor. It is still the exact same violation that the government was contending Vickers would not engage in six weeks later. I understand your argument. Let me ask you this question. You say there was a guard there who was there at the beginning of all this. And there were a lot of vicious things said between these two men. And then the guard withdrew. Was there another guard in that area? No, Your Honor. There was no other guard in the unit. And just to clarify the record, the guard acknowledged that the vicious things he heard were coming from Mr. Vickers. He did not hear vicious things coming from Mr. Vasquez. No one heard vicious things coming from Mr. Vasquez. Mr. Vasquez did not want this fight. He avoided it as best he could by retreating to the Hispanic TV room where he had a right to go. So what you're saying is that there was a high likelihood that these two men would engage in combat. And the guard had to know this. He listened to all this. He's experienced. He knows what goes on in these prisons. And then he withdrew. And it's like having two tigers in a cage. And you know something's going to happen. Instead of trying to separate them, you just walk away and leave them. And that's what started all this. Is that the kernel of your duress? Yes, Your Honor. That is the duress defense. What Warden Beezy's opinion, and he's a warden with 20 years of experience at Terre Haute and several other Federal institutions, would have explained to the jury, is these type of verbal altercations happen in prison, particularly across racial lines as this happened. They're very dangerous. They are at the same level under the BOP severity of punishment. They are a 200 offense level. Just as severe as an actual physical fight is a challenge to a fight. It merits immediate interaction. It merits immediate sanction. Counselor? Officer Ginthrod. I'm sorry. Forgive me for interrupting. I thought you were done. Forgive me. The jury communicated its concern about the fact that the guard left his post. And my question is, how was that communicated to the judge? That was communicated as they returned their verdict. She went back and spoke to them. They expressed to her that they were very disappointed. They perceived that the guards did very little and, if anything, just allowed this fight to happen. They wanted their concerns to be expressed to the warden. What we were not allowed to do was to explain. Who is they now? The jury. All right. We were not allowed to explain to the jury that the guards' failures were actually legally relevant, that they created the defense. I understand your argument. And I think you've answered my question. So it's not on record. It was something that the jury communicated to the judge. To the judge. In the jury room? Pardon? In the jury room? In the jury room. Is that why I can't find it? Yes. And then she provided the letter to the warden at their request. It became part of the sentencing presentation and is in the excerpts of record. I've read it. I'm not sure I finished with your question, Judge Pregerson, but, yes, what Warden Veazey would have explained is that because of the danger that once a challenge to a fight is issued, particularly to a new, smaller inmate by another inmate who's larger, they're more senior, of a different race, this new, smaller inmate is going to either fight or be preyed upon by other inmates. He really is left with no choice. The only way to avoid that situation is to have the guard take immediate curative action against the inmate challenging to a fight and to remove him to the unit. That that's clearly well-established BOP policy and procedure, and there is no question that Jensrod failed, and there is also no question that if Jensrod had done what he was trained to do, what was BOP policy, there never would have been this altercation. Thank you, Your Honors. All right. Good morning. Presiding Judge Pregerson, may it please the Court. Ryan Bounds for the United States. Just to start where defense counsel left off, I do want to emphasize for the Court that there was nothing, absolutely nothing, that precluded Warden Veazey from testifying on behalf of the defense about the danger that was created, the perceived danger that was created by an unmatched threat of violence against an inmate in this situation. The only evidence that was precluded by the district court's ruling was the evidence that the failure of the corrections officer to react appropriately was a violation of BOP rules and regulations, of which the defendant was entirely unaware, i.e., it had nothing to do with the defendant's own state of mind. Now, the danger of the situation, the factual situation. Of which the defendant was unaware. Yes. Unaware of what? Of the BOP rules and regulations that directed the corrections officer to respond in a way that the defense counsel is complaining he failed to do. But why was it? That's just a sensible, logical thing to do. Well, and the warden could testify about what was sensible and logical. What the warden was only precluded from testifying about were what was required by rules and regulations, not what was sensible and logical, what was perceived by the defendant or would have been perceived by a defendant in his shoes. It was only the jot and tittle of administrative regulations that the warden was precluded from testifying about. We know from our own experience, just our own personal experience, but what we've learned that it's — it happens. It's not un — it happens that prison guards will create a situation where fights are going to take place. It's like taking one group of prisoners of a certain ethnicity, putting it in the yard, and bringing another group in at the same time. Well, there's no evidence that that occurred here. And it's going to lead to fights. And it's going to lead to all kinds of altercations. It's going to lead to shootings, sometimes by the guards. It's going to lead to killings. It could lead to all sorts of things, but there's no evidence that any of that occurred here. You know, that can happen. So why would this officer, this prison guard, when he — when he's there, when all this — these words are tossed around and threats are made, why would he walk away? Why would he walk away? I'm loath to get into the details of the propriety of the prison guard's conduct because that, the panel should make no mistake, is the subject of ongoing litigation. But it's civil litigation that has absolutely nothing to do with this defendant's criminal liability. Well, there's civil litigation going on right now. Yes. Counsel, if you could speak a little more slowly. There's a lot of echo. Sorry. And it makes it hard for me to understand. Very good. Thank you. Some of your comments. Well, so there is a civil case going on. So I want to make sure I understand what you just said right now. I just want to say that, apparently, the district court found that Warden Beasley's proposed testimony regarding specific prison regulations and codes that this Officer Jensrud, I think, may have broken, was not relevant to Vazquez's state of mind at the time of the fight. Precisely correct. Okay. Which is the only issue. And he was — so he was precluded from introducing the evidence of the specific regulations that required Officer Jensrud to sanction Vickers for verbally threatening Vazquez. Is that right? Correct. But Mr. Vazquez was able to tell the jury why he believed he had to fight? And he did. And, in addition, Mr. Vazquez was able to call Warden Beasley to testify in a way that would corroborate his concerns. The only thing he could not do was cite DOP regulations, of which Mr. Vazquez admittedly was unaware, and thus had — they had no role in his state of mind. And what's your position on the duress theory? Is there a prima facie case for the duress theory to be considered and if you could kind of talk about that? Sure. The district court quite properly precluded the duress theory from being presented to the jury because the defendant failed to make a prima facie case at a preliminary hearing on the affirmative defenses. And the district court specifically ruled that the failure stemmed from a lack of evidence that this defendant faced an immediate threat of serious bodily injury or death, as well as a reasonable fear that that threat would be acted upon. What's your response to defense counsel's argument that the immediacy comes from the fact that the guard left his post, so his ability to call for help as opposed to engaging in this fight was evaporated when the guard left his post? Well, at least in the briefing and before the district court, the failure of the guard to intervene immediately went more to the availability of escape from the situation, which is the third prong of the duress defense, which the district court did not hold the defendant had failed to make a prima facie showing of. With respect to the immediacy of the threat, it's important to note that even defendant's own expert, Warden Beese, offered his opinion only that there was — that if he — if the defendant had failed to respond with — to the threat of violence with violence, that he faced being preyed upon or assaulted at some unknown point in the future by his fellow gang members. That was the warden's opinion. There was no evidence, no testimony, nothing supporting an inference that this defendant faced an immediate threat of serious bodily injury or death. Why isn't that inference fair from the fact that Vickers had made this threat using the language that I don't want to repeat on record? The only language that — Challenged him to a fight. Challenged him to a fight, yes. Now, I do want to emphasize that defense counsel's claim that the evidence established that Vickers said, I'm going to rip your head off, that was disputed testimony that this Court should not credit. But there was a challenge to a fight.  The point is this didn't go to the jury, so why not? Right. And the district court — the district court correctly ruled that all of the evidence established was that there was going to be a fistfight. A fistfight is not reasonable grounds from which to infer an immediate threat of serious bodily injury or death. And this is — Why not? Why not? Because a fistfight does not necessarily result in injuries akin to organ failure. Well, how can you say that? Because so many of these prisoners have got hidden shivs with them. They're dangerous people. Sometimes they're desperate people. Sometimes they're crazy. They can be. I mean, as the Court well knows from reviewing — Would you want to get into a fight with one of them? In prison? Well, I also want to emphasize, just for the panel's consideration, that despite defense counsel's characterization, the defendant started this altercation at every point. He started the verbal altercation with his impudent remark to another inmate he didn't know by interrupting the conversation that inmate was having with another inmate about how the — Number of push-ups. What's that got to do with — He didn't know how to do anything.  What's that got to do with a warden walking with a — with a correction officer walking away and just leaving these two creatures there? Our position is that the propriety of the corrections officer's conduct is totally irrelevant to this defendant's criminal liability. The only relevance it had was to support the inference that he had no reasonable means of escape from the threatening situation in support of a duress defense that was precluded on entirely different grounds, the lack of a threat of serious bodily injury or death, not a bruise, not even a beating, but serious bodily injury. Because — because as a matter of law, being threatened to a fight in prison doesn't amount to threat of serious bodily injury because it's only a fistfight? Yes. Is that your argument? Yes. And it's — it's perfectly — it's a perfectly reasonable position that the district court took. And, you know, I — the funny thing is that the only — the only argument defense counsel makes in — in disputing the district court's factual finding on that record is that what happened to the victim could have happened to the defendant. And, of course, this case was only prosecuted because the victim did so violently overreacted situation and bashed a man's forehead in by pile-driving him into a concrete floor, which is not normally considered within the bounds of a fistfight. And so I — you know, claiming that what could have — what the defendants — Do you think they're following the Mark — Mark Winsberg rule? As the video shows, there were two seconds, one on each side, appearing with the — with the victim and the defendant. So there's evidence of that. Why wasn't — why wasn't all of this incident captured on video? Because there's no — there's no surveillance camera in the television room where the — most of the physical fight occurred. You mean it's not that it was in opera, but it's not on film? It's not exist? Right. There's not a surveillance camera — there's not a surveillance camera in every public space of the cell block, only in the main central unobstructed areas. So the television rooms are not surveilled, which is presumably why it was chosen as the point for this altercation, which the defendant not only expected but invited and prepared for. The unrebutted testimony at trial was that this defendant set the television room up for a fight. He moved the chairs out of the middle of the room, put the wastebasket up on top of the chairs, and then held one chair in his own hands, awaiting the defendant's arrival, which he was standing at the threshold of the doorway, watching as the victim approached. So this was — this was an anticipated and an invited fight by this defendant that he controlled every step of the way, that he initiated every step of the way, and that he ended with wildly disproportionate force while driving the man to the concrete floor. Your position is that he initiated it every step of the way? Yes. Isn't Vickers who — he made this comment about the number of push-ups. Yes. And then Vickers is the one who responded with the comment I'm trying to avoid saying in open court. Yes. Our position is — our position is certainly not that Vickers did not act disproportionately as well, which is why at sentencing the government recommended a downward variance from the applicable guideline range. So is it really fair to say that the defendant initiated this at every step of the way, counsel? Well, he initiated it. I didn't say that he was solely responsible or that he drove every escalation, but he interjected himself in a conversation in which he was not invited to make an impudent remark that, of course — To say you didn't do that number of push-ups. No. He said you don't know how to do them, old man. Okay. I mentioned that — Well, would you say that to somebody you didn't know? I mean, that's sort of an impudent remark, isn't it? I mean, that's — that's our position, is that an invited, perfectly predictable bridge on the part of the victim who is uncontested, overreacted, and then it escalated quite naturally from there to a fight between the two men. And at the — at the physical altercation, it is the testimony that the jury obviously accepted, or this credit at least must hold the jury could have accepted, that the entered the room, lunged at the victim, pushed the victim to the ground, pummeled him on the ground, and then ultimately, when the victim was barely conscious with his arms hanging limply at his side, piledrove him into the concrete floor. That is controlling and initiating every step of this altercation and acting wildly disproportionately in causing the injury that resulted. So we do believe that the verdict of the jury and the sentence imposed by the court should be affirmed by this Court. It was an unfortunate circumstance, as defense counsel has noted, but it was entirely  Thank you, Your Honor. A couple of issues, Your Honor. The contention of piledriving, that is the testimony from Mr. Morris that was demonstrated by the dummy destruction. The contention of what? The Mr. Vasquez piledrove Mr. Vickers to the floor that caused this injury. Piledrove. Piledrove. That is the term used by the assistant U.S. attorney. That was the contention of Mr. Morris, which he demonstrated with the dummy in the startling manner which required us to move for a mistrial. The judge denied the mistrial. We contend that was error. She nevertheless instructed the jury to disregard. Morris's second testimony confirmed what every other witness said, which was that Mr. Vasquez was on his knees with Vickers over him at the time of the throw over Vickers, over Mr. Vasquez's head that resulted in Mr. Vickers falling. On your knees with someone over you is not a position from which one can engage in piledriving. In terms of what we were allowed to present with Dr. — I'm sorry, Warden Beese, we were not seeking to present specific rules and regulations of the BOP. We are seeking to present the information that the guard had the ability, the duty, the obligation to respond to Vickers' verbal threats, the verbal threats from Vickers, not from Mr. Vasquez, and that he failed to do so. And that his failure to do so is why this proceeded to the altercation. As this Court held in United States v. Mickelson, it is the obligation of the BOP to preclude fights in prison. Kagan. We understand this part of your argument. Can I ask you to give me the citation to the record where I can find evidence that your client was aware before he went into the TV room that the guard had left the area? Yes. The citation we have, and let me give you two citations, one of which I apologize is not in the excerpts but which I would like to provide you in the excerpts. In the excerpts is the statement from Mr. Vasquez on volume 2, page 233. He talks about not wanting this fight and trying to avoid it after the guards left. Vickers calls him to his cell, Vickers' cell. He refuses to go to the cell. Vickers calls him to the ice room. He refuses to go to the ice room. He retreats to the Hispanic TV room. As a Hispanic, he can go to the Hispanic TV room. He knows that that's where a safe place for him. So you haven't lost my question, right? No, I haven't. That in the record is his attempt to avoid the fight. He's retreating from the fight to a place of safety for him. Counsel, my question, your time is up. Oh, I'm sorry. My question, that's okay. I just want to make sure you have an opportunity to answer it. It's an important case for you. But my question is, where in the record does it show me that your client was aware that the guard left the area before your client entered the TV room, please? Correct. And if I'm allowed, I will be presenting this as a supplemental excerpt of record. The transcript from the December 13th hearing, which is in the clerk's record, 54, pages 129 to 130, this is a quote of a statement that Mr. Vasquez gave. The guard working that day saw the entire argument take place on the main floor. He heard it as well. He could have done more to prevent it from escalating anymore, but instead he had completely abandoned the situation and left the unit. He witnessed a heated argument take place in front of other inmates as well, and he left the unit taking control, instead of taking control of the situations. If the guards are not going to keep us safe or at least follow procedures and training in a situation like this, we have to defend ourselves, unfortunately. Too many inmates get stabbed, beat, hurt very bad, even killed in these facilities, and sometimes our only option is to defend itself. That was the statement Mr. Vasquez made. In terms of a contention that a court can find is a matter of law, that fisticuffs in prison do not give a reasonable fear of serious bodily injury. There is no law in support. A history of a review of the prison fights document serious bodily injury to death, loss of eyes, all have occurred from fisticuffs in prison. This we cite a number of cases in our reply brief on pages 3 to 4. And in this very case, serious bodily injury could have occurred. It could have just as easy been Mr. Vasquez, who ended up thrown over the shoulder of Mr. Vickers and suffered serious bodily injury. The elements of the arrest were presented. Ms. Warden Beese should have been allowed to explain to the jury why the guards' actions meant that Mr. Vasquez had no option, which is what he, in fact, did perceive himself. If there are no further questions. Kennedy. What were those record sites that you gave us? Yes, Your Honor. And I will submit. They're just two pages of a transcript of the December 13th hearing. They were filed in the clerk's record at 54. The quote is on page 129 to 130. And I'll just. Why don't you just slow down? I'm sorry, Your Honor. You're like a train going 80 miles an hour. Yes. Slow down. So where are they? I can't write that down. The clerk's record, 54, is where that transcript is filed. It's a. The clerk's record. Why don't you fill out a gum sheet? We'll give you a gum sheet to fill out. You know what that is? No, I don't. What is that? You'll learn something today. Okay. We'll give you a gum sheet. You fill it out. And save time. I'll tell you later. Okay. I can also just provide it in the letter, Your Honors. No, no. We'll give you a gum sheet. Thank you. And some chewing gum with it. Thank you, Your Honor. If there are no further questions. That's all. Thank you. All right. That matter is submitted.
judges: Pregerson, Murguia, Christen